# Pennsylvania Human Relations Commission v. Chester School District

Guy G. *DeFuria*, *Henry Rhoads* and *Paul H. Rhoads*, of *Rhoads*, *Sinon & Reader*, for appellant.

*Nathan Agran*, Deputy Attorney General, for appellee.

BOWMAN, J., February 7, 1966.—With increasing frequency and intensity, beginning in the latter part of the year 1963 and continuing into the early months of 1964, demonstrations by organized and unorganized groups were carried on in the City of Chester, in protest against a variety of alleged racial discriminatory practices existing in the conduct and operation of the public school system in that city. Efforts by local government officials, school board officials and others, through meetings and discussions with interested groups, were apparently failing in resolving differences. As time passed, general lawlessness and rioting broke out, threatening the peace and dignity of the city and its citizens, which conditions became the grave concern of all responsible persons.

The Pennsylvania Human Relations Commission (commission), having previously attempted to act as a conciliator of the differences that existed, was then directed by the Governor of the Commonwealth to formally undertake to conduct public hearings and act under the powers and authority conferred upon it by law.

It is the power and authority of the commission, as conferred upon it by the Pennsylvania Human Relations Act of October 27, 1955, P. L. 744, as amended, 43 PS §951, et seq., which is in issue in this appeal.

When public hearings commenced on May 4, 1964, certain civil rights groups, believing the commission to be without authority to grant adequate relief, refused to act as complainants. The commission then decided that the hearings would proceed and that the commission itself would act as complainant. It thereupon filed a complaint, naming Chester School District as respondent.

The complaint (paragraph 3(a) through (i)) charges that respondent discriminates against pupils and teachers in its public school system, in that:

1. Respondent maintains all-one-color schools within its school system. (Paragraph 3(a)).

2. Textbooks authorized for use in the public schools by respondent do not treat adequately or ignore entirely the contributions of the Negro in American life. (Paragraph 3(b)).

3. Negro teachers are assigned to all-Negro schools only. (Paragraph 3(c)).

4. Negro secretaries, clerks and telephone operators engaged by the respondent are assigned to all-Negro schools or substantially all-Negro schools only, and none is assigned to administration offices. (Paragraph 3(d)).

5. The physical condition of all-Negro schools and substantially all-Negro schools is noticeably inferior to that of the substantially all-white schools. (Paragraph 3(e)).

6. The educational standards in all-Negro schools are inferior to those in substantially all-white schools; especially in that the Chester School Board has failed to provide for the highest possible educational standards in all-Negro schools, as, for example, by smaller classes, better counseling services and a program of motivation. (Paragraph 3(f)).

7. Respondent has failed to appoint qualified Negroes to supervisory and administrative positions or to encourage Negro personnel to apply for such positions. (Paragraph 3(g)).

8. Boundary lines defining school zones have been maintained and gerrymandered by school authorities in order to perpetuate all-Negro schools and in order to permit white pupils to attend substantially all-white schools. (Paragraph 3(h)).

9. Respondent has failed to adopt and make public an affirmative program and acceptable plan to desegregate the public schools and provide a timetable for implementation. (Paragraph 3(i)).

These actions, the commission avers in its complaint, were violative of the Governor's Code of Fair Practices[1] and of sections 4(1) and 5(i) of the Pennsylvania Human Relations Act. Respondent's answer specifically denies each of the material averments of the complaint, and generally denies that the commission had power to initiate a complaint on its own motion, or that it had the power and authority to act in the premises.

Eight days of public hearings produced a voluminous record of testimony and exhibits. On November 24, 1964, the commission issued its adjudication, in which it denied appellant's motion to dismiss for want of jurisdiction filed at the conclusion of the hearings, and which adjudication contained an extensive discussion, 53 findings of fact, conclusions of law, the "Commission's decision" and a final order. In the "Commission's decision", it dismissed the charges in the complaint relating to discriminatory practices in the use of textbooks (Paragraph 3(c)) and in the appointment of Negroes in supervisory and administrative positions (Paragraph 3(g)). The final order directs appellant school district to cease and desist: (1) from assigning only Negro teachers to schools with all-Negro faculties, (2) from asking for the consent of white teachers before they are assigned to a school now having an all-Negro faculty, (3) from assigning only white teachers to Stetser Elementary School and to Wetherill Elementary School, (4) from assigning only Negro bookkeepers, stenographers and clerks to the all-Negro public schools. Additionally, the school dis-

---

[1] The Governor's Code of Fair Practices, proclaimed June 6, 1963, is stated "to be the governing policy throughout the executive branch of government of the Commonwealth". It affords no legal foundation whatsoever for a complaint against a school district which is a creature or agency of the legislature: Chartiers Valley Joint Schools v. Allegheny County Board of School Directors, 418 Pa. 520 (1965).

trict is ordered to: (5) establish kindergartens at the all-Negro Dewey-Mann, Franklin and Watts elementary schools, (6) desegregate six all-Negro or substantially all-Negro public schools, and (7) formulate a plan consistent with the commission's decision to desegregate its public schools and submit such plan for the commission's approval.

As provided by section 10 of the Pennsylvania Human Relations Act allowing any order of the commission to be reviewed as prescribed by the provisions of the Administrative Agency Law,[2] respondent school district appealed to this court and filed its exceptions to the commission's adjudication. It is this appeal which is before us for disposition.[3]

The scope of our review on appeals from administrative agencies is limited. A decision of such an agency will be sustained unless based upon facts or conclusions not adequately supported by evidence; or unless it has committed a clear abuse of discretion, exceeded its power or based its conclusion or order upon an erroneous interpretation of the law: section 44, Administrative Agency Law, supra; Blairsville National Bank v. Myers, 409 Pa. 526 (1963); Sanitary Water Board v. Coudersport Borough, 81 Dauph. 178 (1963).

Two of the three principal contentions advanced by appellant are directed to the issue of whether the commission's action and its adjudication are based upon its erroneous interpretation of the Pennsylvania Human Relations Act, thus resulting in its making erroneous conclusions of law. The first of these two contentions raises the issue of whether the commission had the power to act as complainant in the proceedings

---

[2] Act of June 4, 1945, P. L. 1388, 71 PS §1710.1, et seq.

[3] By leave of court, the National Association for the Advancement of Colored People and the Chester Parents' Association submitted briefs and were heard as amicus curiae.

it initiated against appellant school district. Appellant maintains that the commission, on its own initiative, lacks the authority to so act when school discrimination is generally charged. Its position is that the correct and only lawful procedure to have followed by the commission in this case would have been to have held investigatory public hearings, as prescribed by section 105.26 of the commission's regulations.[4]

Appellant first points out that prior to the 1961 amendments to the act,[5] the courts of this Commonwealth had complete jurisdiction to prevent discrimination against any public school pupil because of race or color, in either an individual or a class action. Under the Act of June 8, 1881, P. L. 76, it was made unlawful for any school director, superintendent or teacher to make any distinction by reason of the race or color of any pupil. Thus, in Kaine v. Commonwealth ex rel. Manaway, 101 Pa. 490 (1882), it was held that mandamus would lie to compel the school directors and superintendent of the school district to admit a Negro to a particular school when their answer did not specifically deny that he had been refused admission because of race.

The Act of 1881 was repealed by the School Code of May 18, 1911, P. L. 309, but a similar provision has been continued in our public school laws ever since that time. Section 1310 of the Public School Code of 1949 [6], provides, inter alia:

---

[4] "Section 105.26 INVESTIGATORY PUBLIC HEARINGS. The Commission may conduct investigatory public hearings without a complaint to investigate alleged discriminatory practices in employment, education, housing or public accommodations, against any person or group of persons because of race, color, religious creed, ancestry or national origin. During and following such investigatory public hearings, the Commission may issue and make public its findings of fact relating thereto".

[5] Act of February 28, 1961, P. L. 47, expanding the scope and coverage of the original act and changing its title to that of the Pennsylvania Human Relations Act.

[6] Act of March 10, 1949, P. L. 30, 24 PS §13-1310.

"It shall be unlawful for any school directors, superintendent, or teacher to make any distinction whatever, on account of, or by reason of, the race or color of any pupil or scholar who may be in attendance upon, or seeking admission to, any public school maintained wholly or in part under the school laws of the Commonwealth".[7]

Courts have also exercised control over school boards in equity in cases involving violation of law or improper expenditure of public funds: McKinley v. Luzerne Township School District, 383 Pa. 289 (1955); McLaughlin v. Lansford Borough School District, 335 Pa. 17 (1939); Hibbs v. Arensberg, 276 Pa. 24 (1923); Gemmell v. Fox, 241 Pa. 146 (1913).

Because of this existing statutory and decisional law, appellant urges us to conclude that, as applicable to matters of discrimination in a public school system, the legislature had no intention of changing or supplementing this prior law, and thus the commission, under the provisions of the Pennsylvania Human Relations Act, lacks the power to initiate the complaint and employ the procedures provided for in said act. Implicit in appellant's contention would seem to be a correlative contention that a contrary interpretation would, of necessity, repeal existing law vesting matters of school policy and programs in the first instance in local school districts, subject only to review by the courts when such policies or programs are alleged to be contrary to law.

We cannot agree that the statutory and decisional law existing prior to the adoption of the act requires it to be so interpreted, nor that a contrary interpretation would have such a deleterious result in usurping the powers of local school boards over their respective public school districts.

---

[7] See also the Act of June 24, 1939, P. L. 872, 18 PS §4654, which makes it a misdemeanor for anyone to discriminate against public school pupils because of race or color.

Section 12 of the act in question provides:

"(a) The provisions of this act shall be construed liberally for the accomplishment of the purposes thereof, and any law inconsistent with any provisions hereof shall not apply.

"(b) Nothing contained in this act shall be deemed to repeal or supersede any of the provisions of any existing or hereafter adopted . . . law of this Commonwealth relating to discrimination . . .".

It is self-evident from this language that the act repeals only prior inconsistent laws. The procedures established by the act are but an alternative method for the enforcement of the enumerated rights sought to be protected. Such practice is neither unusual nor unconstitutional. To argue, as the main thrust of appellant's argument does, that the legislature did not intend to place general matters of school policy in the hands of the commission does not answer the question as to whether the commission is authorized to act as complainant in this case. Such a contention more properly goes to the extent of the commission's jurisdiction and powers, rather than to whether the commission can act as a complainant in the first instance.

Suffice it to say that we do not find the remainder of appellant's argument in the least bit persuasive, as it leaves totally unexplained the meaning which we are to ascribe to section 9 of the act. That section, after setting forth the procedure to be followed by an individual filing a complaint, provides:

"The Commission *upon its own initiative* or the Attorney General may, in like manner, make, sign and file such complaint." (Italics supplied).

In addition, section 7 provides:

"The Commission shall have the following powers and duties:

". . .

"(f) *To initiate*, receive, investigate and pass

upon complaints charging unlawful discriminatory practices". (Italics supplied).

It is axiomatic that a statute is to be construed, if possible, to give effect to all its parts. To hold that the commission has no power to act as a complainant would be to ignore the clear and express terms of the statute. We, therefore, hold that the commission had the power to act as complainant in this case.

We turn next to consider the extent of the commission's jurisdiction in this case. Of primary importance is the question of whether the commission has authority to act in the area of what has come to be termed as de facto segregation. The position of the commission is clearly stated in its Ninth Annual Report, 1964, at page 30:

"Even when school segregation is the result of housing conditions and not because of deliberate discrimination, the commission feels it necessary that affirmative steps must be taken by boards of public school districts to alleviate racial imbalance, regardless of its cause. Positive, corrective measures are often feasible and it is not justifiable for boards of public school districts to take refuge in the fact that the original condition of segregation is not of their making".

De facto segregation is a meaningful term, and yet one which remains undefined in its full concept. Originally coined to describe a factually discriminatory condition beyond the orbit of constitutionally protected individual rights, it means many things to many people. As it relates to public schools, it is said to be a condition which exists not from any formal legal classification based on race or color—which would be violative of constitutionally protected rights—but rather arises from the effect of residential segregation upon patterns of neighborhood school attendance districts. The resulting racial imbalance

of predominantly or all-Negro schools in areas of the Commonwealth, the commission contends, is not only a proper subject of legislative concern, but one upon which it has already spoken by adopting the Pennsylvania Human Relations Act. And this is so, contends the commission, notwithstanding that the legislature has not attempted to define the term, nor has it spoken in any way as to the standards to be applied or otherwise directed the commission in its venture into this most difficult and complex subject.

The commission advances several arguments in support of its position. We will consider each of them separately.

As we have previously noted, the complaint in this case was brought under section 5(i)(1) of the act, which provides:

"Section 5. . . It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, or except where based upon applicable security regulations established by the United States or the Commonwealth of Pennsylvania:

". . .

"(i) For any person being the owner, lessee, proprietor, manager, superintendent, agent or employe of any place of public accommodation, resort or amusement to:

"(1) Refuse, withhold from, or deny to any person because of his race, color, religious creed, ancestry or national origin, either directly or indirectly, any of the accommodations, advantages, facilities or privileges of such place of public accommodation, resort or amusement".

Section 4(l) of the act defines "places of public accommodation, resort or amusement" to include kindergartens, primary and secondary schools, and high schools. The only other pertinent section to the present inquiry is section 4(g) of the act, which provides: "The term 'discriminate' includes segregate".

The commission contends that the words "directly or indirectly", used in section 5(i)(1) above, indicate a clear intention of the legislature that de facto segregation is a subject within the commission's jurisdiction.

Preliminarily, we note that in interpreting the intention of the legislature, the court must take into consideration more than the literal words of the act: New York Life Insurance Company v. Guaranty Corporation, 321 Pa. 359 (1936). In Swartley v. Harris, 351 Pa. 116 (1944), our Supreme Court said at page 119:

". . . The language of a statute must be read in a sense which harmonizes with the subject matter and its general purpose and object. The general design and purpose of the law is to be kept in view and the statute given a fair and reasonable construction with a view to effecting its purpose and object, even if it be necessary, in so doing, to restrict somewhat the force of subsidiary provisions that otherwise would conflict with the paramount intent: 25 R.C.L. Sec. 253, page 1013; Pocono Manor Association et al. v. Allen et al., 337 Pa. 442, 12 A. 2d 32".

We cannot agree with the commission that the use of the phrase "directly or indirectly" evidences a clear and unambiguous intent that de facto segregation was to be within the scope of its jurisdiction and powers. The phrase "directly or indirectly" is frequently employed in drafting statutes and legal instruments. The volume of litigation involving the meaning of this phrase, however, indicates that its use in any particular context is often ambiguous. See 12A Words and Phrases 151-54. As used in this particular statute, it is clear that the phrase "either directly or indirectly" relates to and modifies the words "refuse, withhold from, or deny". Such words contemplate intentional or affirmative acts on the part of the wrongdoer. Read in this manner, as we believe it must, the

statute negates, rather than supports, the commission's contention, for no matter how the term "de facto segregation" may ultimately be defined in total meaning, no instances have been found in researching this subject in which it has been applied to describe a condition brought about by intentional or affirmative acts directed towards an individual's race or color.

The commission, however, also points to section 2(a) of the act as evidence that the legislature intended it to act in matters of de facto segregation. Section 2(a) provides:

"Findings and Declaration of Policy"

"The practice or policy of discrimination against individuals or groups by reason of their race, color, religious creed, ancestry, age or national origin is a matter of concern to the Commonwealth. Such discrimination foments domestic strife and unrest, threatens the rights and privileges of the inhabitants of the Commonwealth, and undermines the foundations of a free democratic state. The denial of equal employment, housing and public accommodation opportunities because of such discrimination, and the consequent failure to utilize the productive capacities of individuals to their fullest extent, deprives large segments of the population of the Commonwealth of earnings necessary to maintain decent standards of living, necessitates their resort to public relief and intensifies group conflicts, thereby resulting in grave injury to the public health and welfare, compels many individuals to live in dwellings which are substandard, unhealthful and overcrowded, resulting in racial segregation in public schools and other community facilities, juvenile delinquency and other evils, thereby threatening the peace, health, safety and general welfare of the Commonwealth and its inhabitants".

It is significant to note that the legislature, in this policy declaration, states that "racial segregation in

the public schools" is *the result of* discrimination in the area of the denial of equal housing accommodations. It does not say that racial imbalance in the public schools (which are public accommodations) is, in itself, a discriminatory practice. Yet this is precisely what we would have to read into this policy statement, if the commission's contention is to be upheld. We can find no such inference. Further, read in its entirety, this declaration of policy repeatedly relates the concept of discrimination not to the mere existence of a fact situation, but rather to a fact situation being brought about by or resulting from some affirmative act on the part of the actor directed to another's race or color. Discrimination is first alluded to as a "practice or policy", thus suggesting an intent on the part of the actor; and thereafter throughout the section the legislature condemns, as against the public interest, discrimination *because of* or *by reason of* race or color.

If, by the enforcement of the act, discrimination in the areas of employment and housing is largely overcome, or through the recognition by man of the inherent worth of his neighbor regardless of race, creed or color, de facto segregation would to a substantial degree also be overcome, as racial imbalance in the public schools is essentially a result of patterns of neighborhood school attendance districts. Thus, while racial imbalance in the public schools can be said to be the result of discriminatory practices, it cannot be said to be discrimination in and of itself, within the intendment of the legislature's declaration of policy as expressed in section 2 of the act. We, therefore, conclude that section 2(a) shows no intent on the part of the legislature to confer jurisdiction upon the commission to deal with de facto segregation in the public schools.

In so concluding, we are not unmindful of the fact

that at the time of the enactment of the Pennsylvania Human Relations Act and its subsequent amendments, this Nation was and is still engaged in a social revolution of a magnitude never previously experienced. Civil rights groups have been outspoken in their demands for better education. Public school classrooms have become a focal point for discussion in communities where substantial racial imbalance exists. The commission argues that the fact that the legislature, during 1961, enacted two separate acts dealing with equal opportunities in educational institutions [8] shows that it had in mind the problem of de facto segregation. We believe, however, that if the legislature had intended the commission to have the power to deal with such a controversial subject as that of racial imbalance in the public schools, such an intent would have been clearly expressed.

Lastly, the commission argues that "segregate", as used in section 4(g), embraces within its meaning the concept of de facto segregation. In the absence of legislative definitions, words are ascribed their ordinary definitions: Commonwealth v. Dewan, 181 Pa. Superior Ct. 203 (1956). In Webster's Third International Dictionary, we find the following definition of "segregate": "1: to separate or set apart from others or from the general mass or main body . . . 2: to cause or force the separation of (as races or social classes) from the rest of society or from a larger group. . . ." These definitions imply an active policy of discrimination, rather than a passive de facto state of separation.

Additional support for our belief that the common use of the word "segregate" does not cover racial imbalance is found in Girard College Trusteeship, 391 Pa. 434 (1958). The court there said, page 456:

---

[8] Pennsylvania Fair Educational Opportunities Act of July 17, 1961, P. L. 776, and the act here in question.

". . . The Orphans' Court did not act to *exclude* Negroes from Girard College. None had ever been admitted. What the Orphans' Court did was to refuse to admit the Negro applicants because they did not qualify for admission under the terms of Girard's will. And, to speak of Girard College as remaining 'segregated' as a result of the Orphans' Court action is to use a term whose present-day stigmatizing connotation has no proper place in this case".

The failure of the legislature to set forth any definition of de facto segregation or racial imbalance compels us to believe that the legislature did not intend that the commission should deal with such problems. To determine otherwise would also present a serious constitutional question relating to the delegation of legislative powers. Assuming the power of the General Assembly to legislate on this subject, it would have the authority to delegate only within the constitutional limitation that standards be prescribed under which the delegated authority is to act. The statute in question, however, is not only silent as to the definition of de facto segregation, but equally bare of any standards by which the commission is to deal with it. When, precisely, does a public school become racially imbalanced? Is racial imbalance to be determined by the commission on an ad hoc basis, and, if so, is the commission to declare methods or procedures by which it is to be corrected, or does such prerogative still remain with the local school board? All of these questions suggest to us that the legislature did not intend such doubtful and possibly unconstitutional results. As the Federal Court of Appeals (1st Cir.) recently noted, in Springfield School Committee v. Barksdale, 348 F. 2d 261 (1965), at page 264:

"We pass the unsettling problem which would face every school committee of anticipating what amount of imbalance the local federal court will consider

equivalent to segregation. The difficulties prophesied in applying the relatively simple rule of 'one man, one vote' would seem small in comparison. Deciding what is excessive racial imbalance necessarily involves the resolution of expert appraisals of highly intangible factors. But more fundamentally, when the goal is to equalize educational opportunity for all students, it would be no better to consider the Negro's special interests exclusively than it would be to disregard them completely".

For all of the above stated reasons, we conclude that the Pennsylvania Human Relations Commission has no authority to act in the area of de facto segregation in the public schools.

Appellant's third principal contention goes to the issue of whether the record made before the commission supports 26 of the 53 findings of fact made by it to which appellant has excepted, as it has to the commission's conclusions of law, "decision" and final order founded upon these disputed fact findings.

As previously noted, the scope of our review in an appeal from an administrative agency is limited to a determination of whether such findings of fact are supported by substantial evidence. We are not to substitute our judgment for that of the commission.

In undertaking such a review, however, we need not consider a substantial number of such findings of fact to which appellant has excepted,[9] as they unquestionably relate exclusively to the subject of de facto segregation, which we have concluded as not being within the ambit of the provisions of the Pennsylvania Human Relations Act.

Of the remaining findings of fact to which appellant has excepted—being 16 in all—those numbered 29, 31, 32 and 35 were not orally argued or contested by appellant in its brief and, therefore, will be given

---

[9] Numbers 5, 18, 23, 42, 43, 44, 45, 50, 51, 52.

no further consideration. The remaining 12 [10] might be considered as supporting the commission's conclusions of law, its "decision" and final order on subject matters, which appellant does not contest as being within the jurisdiction of the commission under the provisions of the act. In general terms, these go to matters of discrimination against pupils *because of race*, or like discriminatory practices against appellant's professional and non-professional employes.

Does the record support the commission's findings of fact in these areas, and thus afford to it a proper foundation for its legal conclusions that appellant has violated the provisions of the act? [11]

In resolving this question, our task is difficult, because the commission, in its adjudication, discusses at length, and makes findings of fact and conclusions without any effort to distinguish between, de facto segregation and those discriminatory practices which are proscribed by the act. Having assumed at the outset that it had jurisdiction over the subject matter of de facto segregation, it then proceeded to perform its duties and render its adjudication in this context. As to any particular findings of fact, it is difficult, for this reason, to determine whether the commission, in making such a finding, did so in the context of de facto segregation or in the context of a discriminatory practice admittedly within its jurisdiction.

Illustrative of this difficulty is the commission's finding of fact no. 13, which determines that:

"High school and junior high school pupils are accepted by respondent on a tuition basis from sur-

---

[10] Numbers 13, 20, 21, 22, 24, 25, 26, 38, 39, 40, 41, 53.

[11] The commission's determinations relating to discriminatory practices of appellant against its professional and non-professional employes are grounded upon section 5(a) of the act which was not pleaded in its complaint as the legal basis for the related factual averments alleged to have been unlawful. Appellant, however, has not raised this variance of allegation and proof.

rounding school districts, particularly Chester Township and Upland Township. Junior high school tuition students are both white and Negro and are assigned to Douglass and Showalter in Chester. Only Negro tuition pupils are being assigned to the all-Negro Douglass Junior High School".

This finding is factually correct as stated, and is amply supported by credible evidence. However, whether the commission adopted this finding of fact to support its conclusion that appellant was guilty of de facto segregation or of a discriminatory practice prohibited by the act is impossible to determine. If adopted for the former purpose, it acted beyond its authority in doing so. If adopted for the latter purpose, the necessary inference taken from such facts to reach the conclusion that appellant was in violation of the act—that Negro tuition students were assigned to all-Negro or predominantly Negro schools *because of* their race—is not supported by the record. Rather, the record refutes any such inference, as the only evidence on this subject is the testimony of school officials to the effect that geographical boundary lines were uniformly applied in the assignment of tuition pupils to local schools, and there is no evidence whatsoever that such lines were established or maintained for the sole or partial purpose of discriminating against pupils of any color or race. That de facto segregation of Negro tuition pupils resulted therefrom cannot be denied. That appellant is guilty, as a matter of inference from such facts, of violation of the act cannot be sustained, absent substantial evidence to support such in inference. Such evidence cannot be characterized as substantial in supporting such an inference.

Findings of fact numbers 20, 21, 22, 24 and 26 relate to the issue of whether appellant is guilty of violations of sections 4(g) and 5(i) of the act, which prohibit discriminatory practices, including segrega-

tion, against pupils in public schools because of their race or color.

In concluding that appellant is guilty of such discriminatory practice, the commission supports its conclusion upon the following findings:

"20. Prior to 1954, Negro pupils were required by the Chester School District to pass all-white schools near their homes to attend more distant schools which were all-Negro.

"21. During the past ten years, when boundary lines for the William Penn School were established, Negro pupils were permitted by respondent to cross such lines in order to attend the all-Negro Dewey-Mann School. As of May, 1964, such practice was not permitted.

"22. Boundary lines for elementary schools are known to have been established by respondent in August, 1954 and are known to have been changed by respondent in September, 1959, on May 4, 1964 and on August 24, 1964. During the past ten years, however, other changes in boundary lines, not recorded in the Chester School Board's minutes, were made changing the western vertical boundary line defining the school zone for the all-Negro Dewey-Mann School.

"24. Prior to May 4, 1964, at least one white pupil, Jacqueline Kelly, 905 Palmer Street, Chester, Pennsylvania, had been crossing the boundary lines defining the all-Negro Dewey-Mann school zone and attending the substantially all-white William Penn School.

"25. On May 4, 1964, the Chester School Board changed elementary school boundary lines and, among other changes, eliminated from the pre-existing boundary lines defining the school zone for the all-Negro Dewey-Mann School, an area located in the northwest portion of such zone, said area being composed of white residents only.

"26. On August 24, 1964, the Chester School Board

again changed boundary lines for elementary schools, eliminating all changes but one in boundary lines put into effect on May 4, 1964. The change not disturbed by the Board's action of August 24, 1964, was the elimination of the all-white residential area from the Dewey-Mann school zone".

If these findings of fact are supported by the record, they afford a factual basis for the commission's conclusion. Taken together, a reasonable person could properly conclude that appellant in the past and currently maintains school attendance boundary lines with the intent and purpose in mind of segregating pupils by reason of their color or race, contrary to the provisions of the act. Appellant contends, however, that some of these findings are factually incorrect, questions the relevancy of others, and argues that unfounded inferences are taken by the commission from the record in making such findings and conclusions. In substance, appellant argues that while one or two isolated instances in the past did exist, whereby a Negro pupil did not attend a school otherwise within the neighborhood attendance area of the child's residence, these instances were in the distant past. Appellant further contends that the record does not support findings of any such recent actions on the part of appellant whereby school attendance boundary lines have been changed with an intent to discriminate against any pupil because of race or color, or that any such condition in fact exists.

We shall first consider the evidence said by the commission to support each of these contested findings, and then consider them together.

The evidence in support of finding of fact no. 20 is solely that of a school principal of an all-Negro pupil school, who testified that *in 1946*, appellant maintained "fluid boundary lines" requiring Negro pupils to go out of their neighborhood areas to attend a public school.

Except for showing possible motive or intent on the part of appellant at the present time, the relevancy and materiality of this evidence and the finding of fact made therefrom is nebulous. Not only does it relate to a time long preceding the date of the act in question, but it also precedes in time the decision of the U. S. Supreme Court in Brown v. Board of Education of Topeka, 347 U. S. 483, in 1954, which afforded constitutional protection against such action on the part of public school systems.

The only evidence in support of finding of fact no. 21 is the testimony of the superintendent of schools, who testified that the children of several Negro families were permitted to attend their former predominantly Negro school after new neighborhood attendance boundary lines were established for a newly erected school in the area, which would have placed such children in a predominantly white school, a practice which no longer exists.

One would assume from the commission's findings that such a practice was not discontinued until May of 1964. To the contrary, the only evidence on this point is that it was discontinued shortly after the new school was operative, some four or five years prior to 1964. Hence, while the commission's finding is factually correct, the inference to be taken from such facts is unsupportable. Nor can we find in such activity alone any discriminatory practice in violation of the act as applicable to Negro pupils. A privilege afforded to a group of pupils cannot be characterized as a discriminatory practice against these same pupils. Hence, the finding in itself affords no foundation for the legal conclusion of the commission that appellant is in violation of the act. An exhaustive review of the record reveals that while most of the constituent facts contained in the commission's finding of fact no. 22 are supported by the record, the inference which the commission seeks to take from such facts is without any record support.

At various times during the course of the hearings, the commission called several school officials, who testified on the subject of neighborhood school attendance boundary lines. While much of this testimony is vague, it does support a finding that in the past such boundary lines were from time to time changed. In spite of crossexamination by commission counsel of its own witnesses, however, the *only* evidence as to the reason for such changes was that they were incident to the completion of a new school facility, or to relieve an overcrowded condition in a particular school. There is no evidence to support an inference that such changes were effected with any purpose or intent other than the factors testified to. Hence, while the finding may be factually correct, it affords no foundation whatsoever, either alone or cumulatively, for the commission's conclusion that appellant is in violation of the act. Additionally, as previously noted, even assuming some other motive for its past actions in changing boundary lines at a time when such action was not unlawful affords little weight for a conclusion that appellant is presently violating a subsequently enacted law.

The commission's finding of fact no. 24 is supported by the record. In making this finding, and thereby attaching some weight to it in reaching its legal conclusion, the commission discounted the explanation of a school official who testified that this one pupil—out of some 10,000 pupils—attended the wrong school because of his mistake in applying an established boundary line to an actual geographic area, and that the mistake was promptly corrected when it became known. At most, this evidence and the resulting finding of fact can be characterized as but a mere scintilla of evidence going to the issue of whether the commission's legal conclusion is supportable by the record.

Finding of fact no. 25 is also supported by the record.

Again, however, the issue is what permissible inference may be taken from such facts, rather than the establishment of the facts themselves. We are again faced with rather vague, general and sometimes inconsistent testimony, which the commission contends supports its position. The evidence in support of this finding is found in the testimony of a school official who testified as to the circumstances surrounding the changing of the boundary line in question. On one occasion, he stated, it was done to alleviate overcrowding, and on another occasion that it was done to effect a straight boundary line. This same official and others also generally testified that neighborhood school attendance boundary lines were established, maintained and modified on the basis of population changes, in relation to number of school pupils, and that while de facto segregation was admittedly a factual result, no action on this subject was taken by appellant with regard to the race or color of the pupils to be served. There is also testimony in the record that while the affected geographical area in question was basically one of white residents, their school age children all attended parochial schools. Hence, the result of this action by appellant was not to transfer white pupils from a predominantly Negro to a predominantly white school, but at most the creation of an eligibility for white pupils in said area to attend a predominantly white rather than a predominantly Negro school. And there is no evidence in the record that any such change occurred. From this evidence and finding of fact, the commission infers that appellant is guilty of a discriminatory practice contrary to the provisions of the act. Viewed even in its most favorable light, such evidence is but a mere scintilla of evidence to support the ultimate inference the commission has taken from it and, standing alone, is wholly inadequate to support the commission's conclusion.

In making its finding of fact no. 26, the commission relies to a great extent upon the same testimony it relied upon to support finding no. 25, and draws the same inference therefrom. To the extent this finding suggests that school attendance boundary lines were from time to time changed, it is supported by the record, as is its finding that line adjustments were made by appellant in August of 1964. That such boundary lines, with the exception of one, were restored in August 1964 to their pre-May 1964 positions lacks definitive record support. Again, however, it is the inference to be taken from the supporting record that is of importance here. In reviewing this and the preceding finding by the commission, we have read and reread the record and reviewed the exhibits in a vain search for any evidence to support the commission's conclusion. We can find none. Despite crossexamination of its own witnesses, despite questions framed to elicit a particular answer, and despite comments, observations and questions by the commission's counsel on the subject of de facto segregation and possible means to alleviate it during the course of his examination of these witnesses, they persisted in their position that school attendance boundary lines were established and from time to time changed to meet neighborhood school population problems, and that such actions were not taken with regard to the race or color of the pupils. It is from this evidence that the commission finds and concludes by inference that appellant is guilty of discriminatory practices as to its pupils, contrary to the provisions of the act.

Recognizing the importance of this case as not only one of first impression on the subject of the jurisdiction of the commission, but also as one on a subject which occupies the minds of all citizens, we have carefully and deliberately weighed the record in search of support for the commission's findings and concluding

inference that appellant has discriminated against its pupils because of race or color. We have reviewed the individual findings and the record said to support them. We have concluded that taken individually, most are wholly unsupported by any substantial evidence or by, at best, a mere scintilla of evidence, and that individually none of such findings support the commission's legal conclusion on this issue. We are also of the opinion that considered collectively, these findings are not supported by substantial evidence from which one could properly infer appellant to have been in violation of the act. We, therefore, conclude that the commission, in determining as a matter of law that appellant is in violation of the act in discriminating against its pupils by reason of their race or color, is not supported by substantial evidence, and is therefore arbitrary and capricious.

While the commission's findings of fact nos. 38, 39, 40 and 41 essentially relate to the subject matter of de facto segregation,[12] which subject we have already concluded as not being within its jurisdiction, in its brief in support of these findings, it seems to contend that since the United States Supreme Court has declared separate but equal school facilities to be violative of a person's constitutional rights, there is no reason why separate schools created by housing patterns should be considered differently. To the extent that such a contention inferentially raises constitutional questions, we need not pass upon them, as both parties agree that no constitutional issues have been raised in this case or are before this court on appeal.[13]

---

[12] Together with those listed in footnote 9.

[13] As to whether de facto segregation is violative of constitutional protection see: Taylor v. Board of Education of City School District of City of New Rochelle, 191 F. Supp. 181 (S.D.N.Y. 1961); aff'd. 294 F. 2d 36 (2d Cir. 1961); cert. denied, 368 U. S. 940 (1961); Evans v. Buchanan, 207 F. Supp. 820 (1962); Bell v. School City of Gary, Indiana, 324 F. 2d 209 (1963); cert. denied, 377 U. S. 924 (1964).

If such a contention is advanced in support of the commission's position that it has jurisdiction over the subject matter of de facto segregation, we have already concluded that it does not. At most, therefore, it is but an argument in persuasion of the position that the subject of de facto segregation should be brought within the jurisdiction of the commission, an argument properly directed to the legislature, and not to this court.

Finding of fact no. 53 by the commission consists of a summation of other findings, including many relating solely to the subject matter of de facto segregation, and also includes a number of facts upon which the commission chose not to make any conclusion of law or require action on the part of appellant in its final order. Both parties in their briefs and arguments recognize the summary nature of this finding. Accordingly, we do not deem it necessary to comment further thereon.

Having determined: (a) that the commission had the authority to initiate this proceeding against appellant; (b) that it is without statutory authority to act on the subject of de facto segregation; and (c) that its findings of fact in support of its legal conclusion that appellant is in violation of the provisions of the act prohibiting discrimination against pupils by reason or race or color were not supported by substantial evidence, there remain for disposition certain portions of the commission's conclusions of law, "decision" and final order to which appellant has excepted, and which will require further comment because of their generality.

Appellant has excepted to five of eight conclusions of law made by the commission. These conclusions state:

"4. At all times herein mentioned, the Pennsylvania Human Relations Commission had and still has

jurisdiction over the respondent, Chester School District.

"5. At all times herein mentioned, the Pennsylvania Human Relations Commission had and still has jurisdiction over the subject matter of this proceeding and over the instant complaint.

"6. The unlawful discriminatory practices involved herein have occurred and still occur within the Commonwealth of Pennsylvania and have deprived Negroes, residents of the City of Chester, Delaware County, Pennsylvania, of their civil rights.

"7. At all times herein mentioned, respondent has committed and continues to commit unlawful discriminatory practices in violation of sections 4(g) and 5(a) of the Pennsylvania Human Relations Act, in that the respondent assigns only Negro teachers to all-Negro schools and only Negro clerks to all-Negro schools.

"8. At all times herein mentioned, respondent has committed and continues to commit unlawful discriminatory practices in violation of sections 4(g) and 5(i) of the Pennsylvania Human Relations Act, in that (1) respondent maintains segregated all-Negro and substantially all-Negro public schools within its school system, (2) respondent has established school zones which confine the Negro to all-Negro schools, (3) respondent has failed to make available kindergartens in sufficient number to accommodate the children of Negroes living in Chester, (4) respondent has permitted the physical condition of the all-Negro school buildings to be inferior to that of other school buildings in its system, and (5) respondent has failed to accept or adopt any affirmative program or plan whereunder the schools it administers will be effectively desegregated within a reasonable time".

For reasons heretofore set forth, appellant's exception to conclusion of law no. 4 will be dismissed, and will be sustained in part to no. 5 to the extent that

the conclusion includes the subject matter of de facto segregation. Appellant's exception to conclusion no. 6 will likewise be sustained to the extent that it encompasses the subject matter of de facto segregation. To the extent that this conclusion also includes a legal determination that appellant, in establishing, maintaining and revising neighborhood school attendance boundary lines, did so in violation of the act, appellant's exception thereto will also be sustained, as any such conclusion is not founded upon substantial evidence for the reasons hereinbefore set forth.

Appellant's exception to conclusion no. 7 will be dismissed. Other than contesting the commission's authority to initiate these proceedings against appellant on the subject matter of this legal conclusion—as well as all other subject matters contained in the complaint — appellant neither attacks the facts upon which this conclusion is founded nor that it is within the prohibited practices set forth in the act.

The commission's conclusion no. 8 is in part a summary of previous conclusions and in part conclusions pertaining to other subject matters. To the extent that the components of this conclusion relate to the subject matter of de facto segregation,[14] appellant's exceptions thereto will be sustained, as we have concluded de facto segregation to be beyond its jurisdiction. To the extent that it includes a legal determination that appellant, in maintaining neighborhood school attendance boundary lines, is in violation of the act, appellant's exception will likewise be sustained, for reasons previously expressed. Clause (3) of said conclusion, to the effect that appellant engaged in a discriminatory act in not providing kindergartens in all-Negro schools, is not seriously contested by appellant, and we are advised in the contesting parties' briefs that this condition has been or is being reme-

---

[14] Clauses (1), (2) and (5) of conclusion of law no. 8.

died. This portion of the conclusion, therefore, will be sustained. Clause (4) of said conclusion—to the effect that appellant engaged in a discriminatory practice in permitting the physical condition of all-Negro school buildings to be inferior to that of other school buildings in the school system—was not contested by appellant as lacking substantial evidence to support it or as being beyond the discriminatory practices prohibited by the act. It, therefore, will be sustained. It is to be noted, however, that the commission, in its final order, took no action on this conclusion, for the avowed reason that directing this condition to be remedied would promote continued de facto segregation. At oral argument, the court was advised that these conditions were being remedied.

After having made its conclusions of law, the commission, in its adjudication, next set forth the "Commission's Decision", to which portions thereof appellant specifically excepted. This novel portion of the adjudication is essentially a restatement or summary of previously stated conclusions of law. No purpose would be served in restating these conclusions, and we will consider the same as surplusage in disposing of this appeal.

Finally, appellant generally excepts to the commission's final order, which affirmatively directs appellant to take particular actions or procedures on the various subject matters which it found to exist and to be violative of the discriminatory practices prohibited by the act. The contents of this final order have hereinbefore been summarized. The subject matters encompassed within the first five numbered paragraphs we have concluded—or appellant has not contested—as being within the discriminatory practices prohibited by the act. De facto segregation, the subject matter of paragraphs 6 and 7 of the final order, we have concluded as being beyond the authority of the

commission. It, therefore, lacks jurisdiction to make any order against appellant concerning the same, and appellant's exception to the final order will be sustained to this extent.

For the reasons heretofore expressed, we make the following

CONCLUSIONS OF LAW

1. The Pennsylvania Human Relations Commission, under the provisions of the Pennsylvania Human Relations Act, has the authority to initiate on its own behalf a complaint against a school district of the Commonwealth, alleging respondent to be engaged in one or more discriminatory practices prohibited by the act.

2. The Pennsylvania Human Relations Act does not prohibit, as a discriminatory practice in the public school systems of the Commonwealth, the practice of establishing, maintaining or revising neighborhood school attendance boundary lines, when such boundary lines are established, maintained or revised without regard to the race, color, religious creed or national origin of its pupils or potential pupils, even though such practice results in racial imbalance in particular neighborhood schools in the system.

3. There is no substantial evidence in the record made at the hearings before the commission to support its conclusion of law that the Chester School District, subsequent to the adoption of the Pennsylvania Human Relations Act, established, maintained or revised its neighborhood school attendance boundary lines because of or by reason of the race, color, religious creed or national origin of its pupils or potential pupils.

4. The conclusions of law of the Pennsylvania Human Relations Commission that the Chester School District, contrary to the provisions of the Pennsylvania Human Relations Act, has committed unlawful discriminatory practices in that: (a) it assigns only

Negro teachers to all-Negro schools and only Negro clerks to all-Negro schools, (b) it has failed to make available kindergartens in sufficient numbers to accommodate the children of Negroes living in Chester, and (c) it has permitted the physical condition of all-Negro school buildings to be inferior to that of other school buildings in its system, are supported by substantial evidence.

Accordingly, we make the following

### ORDER

And now, February 7, 1966, the appeal of Chester School District is sustained in part and dismissed in part, and the adjudication of the commission is modified as follows:

1. Its conclusions of law nos. 1, 2, 3 and 4 are affirmed.

2. Its conclusion of law no. 5 is affirmed, except to the extent it includes a determination that the commission has jurisdiction over the subject matter of de facto segregation in the public schools. As encompassing this subject, it is set aside.

3. Its conclusion of law no. 6 is affirmed in part, to the extent that it includes discriminatory practices not contested by appellant as being within its jurisdiction. It is set aside to the extent that it concludes a determination that the commission has jurisdiction over de facto segregation in the public school system, and that it determines appellant to have unlawfully discriminated against its pupils or potential pupils contrary to the act in the establishment, maintenance and revision of school attendance boundary lines.

4. Its conclusion of law no. 7 is affirmed.

5. Clauses (1), (2) and (5) of its conclusion of law no. 8 are set aside. Clauses (3) and (4) of said conclusion are affirmed.

6. Paragraphs 1 through 5 of its final order are affirmed and paragraphs 6 and 7 thereof are set aside.

Each party is to bear its own costs.

Judge William W. Lipsitt took no part in the consideration or determination of this case.